(Superior Court of Cincinnati.—*Special Term.*)

CHARLES W. PIKE *v.* THE EQUITABLE NATIONAL BANK.*

---

*Conversion— When title to the property obtained is good in a third party.*

An action for conversion will not lie against a third party who has parted with value for goods upon the apparent title of the wrong doer and his right to dispose of the property, and when the title was acquired without notice of the defects or knowledge of circumstances to put such third party on inquiry.

(Decided October, 1894.)

---

HUNT, J.

This is an action in which the plaintiff seeks to recover a judgment against the defendant in the sum of $1,046.50 with interest from December 13, 1892, on the ground of conversion.

The petition, filed July 31, 1893, alleges that the defendant is a corporation under the laws of the United States, and located in the city of Cincinnati, Ohio; that on December 13, 1892, the plaintiff was the owner and entitled to the immediate possession of two hundred and ninety-nine (299) cases, containing five hundred and ninety-eight (598) dozen cans of yellow peaches, of the brand "Perfection," and of the value of ten hundred and forty-six and fifty one-hundredths dollars ($1,046.50), and that on that date defendant unlawfully obtained possession of the said peaches, and unlawfully converted the same to his own use, to the damage of the plaintiff in the amount named.

The answer of the defendant, filed August 9, 1892, admits the corporate existence of the defendant, but denies each and every allegation contained in the petition.

It appears that on June 25. 1892, P. Marsicano, of San Francisco, Cal., through the plaintiff, Charles W. Pike, contracted with A. R. Clark & Co., of Cincinnati, Ohio, for the sale of four hundred (400) cases—eight hundred (800) dozen of canned peaches of the brand "Perfection"—for de-

*(Affirmed by the Court in General Term February 2, 1895.)

livery the latter half of October, at one dollar and fifty cents ($1.50) per dozen.   The terms were sixty days acceptance, or cash ten days, less one and one-half percent., with bill of lading attached.

On the sixteenth day of November, 1892, P. Marsicano assigned the contract to the plaintiff, and sold the peaches called for to the plaintiff.

The plaintiff, Charles W. Pike, November 16, 1892, at San Francisco, Cal., shipped the peaches to Cincinnati to his own order, with instructions to notify A. R. Clark & Co., and on the same day drew on A. R. Clark & Co., through Wells, Fargo & Co., his draft of that date for the price of the peaches, at sixty days, or one and one-half off cash in ten days.   On November 17, 1892, the plaintiff wrote A. R. Clark & Co. a letter inclosing invoice covering shipment made on the sixteenth of November, 1892, of 400 s-s of Perfection Valley peaches, as per contract, and informing them that he had drawn on them for the amount of the invoice, terms 60 days, acceptance or cash, less one and one-half per cent.   On November 17, 1892, the plaintiff drew a draft on A. R. Clark & Co., for $1,200 against the shipment, through Wells, Fargo & Co., his bankers, with the bill of lading attached, for payment or acceptance by A. R. Clark & Co.   On November 29, 1892, A. R. Clark & Co. telegraphed the plaintiff:

"No bill of lading, invoice or notice of shipment of peaches, November 16.   Trace and wire us to whom bill of lading and invoice mailed.   Answer."

On the same date the plaintiff replied by telegraph to A. R. Clark & Co. :

"Draft.   Bill lading at Third National Bank.   Apply.   Am mailing duplicate."

The following day, November 30, 1892, W. W. Blair & Co., the representatives and brokers of the plaintiff in Cincinnati, telegraphed the plaintiff, Clark :

"Draft paid November 8," (referring to a prior transaction).   "Perfection peaches here.   No documents.   Will store.   Wire reply quick."

On December 1, 1892, the plaintiff answered the above telegram, which there was testimony tending to show, was based upon a statement made by A. R. Clark & Co. :

"If bill lading lost, have Clark protest draft and I will instruct railroad deliver without bill lading."

On December 2, 1892, W. W. Blair & Co. wired that the telegram had been received, and that Clark would protect the draft.   This was Clark's answer to W. W. Blair & Co. on submission to them of Pike's telegram.

On December 3, 1892, the plaintiff directed the railroad company to deliver the peaches to A. R. Clark & Co., without bill of lading, which was done, and on the same day A. R. Clark & Co., ware-housed four hundred (400) cases Perfection peaches, with Robert A. Dykins & Co., a storage house in Cincinnati.

On December 10, 1892, A. R. Clark & Co. took out of the warehouse one hundred and one (101) cases of the peaches, and on December 14, 1892, made a bill of sale on settlement to the defendant, the Equitable National Bank, for assorted groceries to the amount of $16,621.37, including 299 cases of Perfection peaches (598 dozen), at $1.81 per dozen, amounting in value to $1,082.38.   The bank surrendered to A. R. Clark & Co., promissory notes which it held, aggregating $16,300, leaving a balance on settlement of $321,67, which was paid to A. R. Clark & Co. by the bank.

The Equitable National Bank, prior to this settlement, had been in possession of the warehouse receipt for the peaches, holding the same as collateral security.   On the same day, but subsequent to the sale of the peaches to the Equitable National Bank, A. R. Clark & Co. made a general assignment for the benefit of creditors, in the Probate Court of Hamilton

County, Ohio, and the inventory shows that the total assets were appraised at $36,390.06 and the liabilities at $166,713.91.   In the appraisement the merchandise was estimated at $23,922.37 and the book accounts at $12,-467.69.   The draft was neither paid nor accepted, and, after the assignment, was returned to Wells, Fargo & Co.

*Mala fides* on the part of the Equitable National Bank is neither claimed nor imputed.   Indeed, it is expressly admitted that the bank acted in good faith in the whole transaction.

It is claimed, that, as the plaintiff shipped the peaches to his own order, and drew for the price with bill of lading attached, A. R. Clark & Co. could not have gotten possession of the bill of lading and the peaches (in absence of waiver) otherwise than by paying or accepting the draft.   In support of the proposition involved, Hutchinson on Carriers, Sections 130, 131, 131A and B ; *Emery's Sons* v. *Irving National Bank*, 25 O. S., 360 ; Benjamin on Sales, Section 399, Am, note to Sections 381-399 ; 2 Am. & Eng. Ency., p. 243, and 21 *Ib.*, pp. 507-9, are cited.   There can be no controversy that where goods are shipped to the order of the consignor, and a draft is drawn for the price of the goods with bill of lading attached, the consignee, in absence of waiver, can not obtain possession of the goods except by paying or accepting the draft.   The solution would not be difficult if there were not other circumstances under which the defendant acquired possession of the property, and which must be considered in the determination of the case.

It is further claimed that A. R. Clark & Co. obtained possession by the fraudulent misrepresentations that the goods were here, the documents lost and that the draft would be protected ; that once in possession, by delivery by carrier, without bill of lading, they neither paid nor accepted the draft, and that, on discovery of the fraud, the presence of the documents and failure to pay or accept, the plaintiff could have replevined the goods without regard to the solvency of the firm of A. R. Clark & Co.

*Kraft, Hoffman & Co.* v. *Dulles & Co.*, 2 C. S. C. R. 116 ; *Whitney* v. *Eaton et al.*, 81 Mass., 225 ; *Armour* v. *Pecker*, 123 Mass., 143 ; *Salomon* v. *Hathaway*, 126 Mass., 482 ; Miller on Conditional Sales, Section 32 ; Benjamin on Sales, Sections 343, 344, are cited in support of the legal principle involved.

It is an elementary principle that the superior equity of a purchaser of property from one who has acquired a title defeasable at the election of the former owner and vendor by reason of fraud, to that of such owner seeking to retake the property, is based upon the evidence of title which the owner has permitted the wrong-doer to assume and possess, and he will be the loser, because of the apparent ownership, if compelled to surrender the property.   The mere possession by the party claiming to hold will not sustain the claim, but the circumstances under and consideration upon which he has acquired the possession are also material.

It has been held, in case of fraud, that the right of the vendor against the vendee would not only prevail against his sub-vendee but against his assignee, (*Kraft, Hoffman et al.* v. *Dulles & Co. et al.*, 2 C. S. R., 116 ; *Hodgson* v. *Barrett*, 33 Ohio St., 63), and against the sub-vendee with notice, (*The Pullman Palace Car Co.* v. *The Globe Rolling Mill Co.*, 4 C. C., 301 ; *Marmaduke & Brown* v. *Harvey, Drake & Co.*, 2 C. S. R., 291), and against the mortgageee for pre-existing debt, (*Warner & Penney* v. *Charles F. Porter*, 2 Dis., 124 ; *Goldsmith, Klaw & Co.* v. *Hain & Myers*, Sr., 1 C. C., 333 ;), and even against his vendee in payment of pre-existing debt.   There is some conflict in the authorities as to the right of the vendor against the vendee for a pre-existing debt, but it seems to have been settled in the case of *Eaton & Co.* v. *Davidson*, 46 Ohio St., 355, that when a purchaser fraudulently obtains goods from the owner and transfers them to another in payment of a pre-existing debt, such pre-existing debt alone will not be a sufficient consid-

eration alone to constitute the transferee a *bona fide* purchaser for value, as against the owner from whom the goods were thus obtained by fraud.

ALLEN, J., in *Birnard et al.* v. *Campbell et al.*, 58 New York, 73, insists that several things must concur to bar the claim of the defrauded vendor. 1. He must have parted with possession of his property with intent to pass the title to the wrong-doer, thus giving him the apparent right of dis-- posal. If property is taken feloniously, or without the consent of the owner, the taker can make no title to it, even to an innocent purchaser with value. 2. A third party must have acquired title from the wrong-doer without notice of the defects in his title, or knowledge of circumstances to put him to an inquiry, as to the source of his title. 3. Such third party must have parted with value upon faith of the apparent title of the wrong-doer, and his right to dispose of the property. If any of these elements are wanting, the vendor, seasonably pursuing his legal right may have his property.

The court further says, on page 79: "There is no good reason or equity in placing the burden of a fraudulent sale upon a *bona fide* vendor rather than upon a *bona fide* purchaser, from the fraudulent vendee, unless the purchaser has parted with his money, or some value, upon the credit of possession or some evidence of title in the vendee, received from the original owner, and by means of which he has induced the purchaser to treat with him as owner.

It has been held in *Stevens et al.* v. *Brennan*, 79 N. Y. 254, that in a suit by a burden to recover goods from one claiming title under the fraudulent vendee, the burden is upon the latter of showing that he is a purchaser in good faith and for value.

There was no evidence offered as to what had become of the original bill of lading of the consignment by the plaintiff of the 400 cases of peaches. It is the testimony of W. A. Lemmon, of the Third National Bank, that there was a bill of lading attached to the draft. The draft was returned to Wells, Fargo & Co., after the failure of Clark. The witness testifies further that the draft was handed to the messenger, but that the witness had no knowledge that the draft had been presented to Clark & Co. The inference that it was lost is emphasized by the fact that the original bill of lading does not appear with the papers attached to the original draft. The court is not satisfied from the evidence that A. R. Clark & Co., subsequent to the getting possession of the goods, obtained the bill of lading from the Third National Bank. There certainly could have been no object on the part of A. R. Clark & Co. in obtaining possession of the bill of lading from the bank after possession of the goods, nor is it likely that the bank would have parted with the bill of lading without either the acceptance or payment of the draft attached to the bill of lading. The plaintiff evidently relied upon the promise of protection to the draft, and by the order of delivery, in the absence of the bill of lading, or the payment, or acceptance of the draft, parted with possession of his property with intent to pass the title to A. R. Clark & Co., thus giving to them the apparent right of disposal.

It is conceded in argument that the Equitable National Bank acquired title from A. R. Clark & Co., without the defects to his title or knowledge of circumstances to put the bank to any inquiry as to the source of title, while the evidence shows that the Equitable National Bank parted with some value, to-wit, the payment of $321.67, in the final transaction, by which the title to the peaches was acquired. It is true that the warehouse receipt was left as a general collateral with the Equitable National Bank, and the cashier was unable to state when in fact the bank got the warehouse receipt; yet he testifies that the last credit was for $321.47, on December 14, 1892, and was a credit of the excess of the bill which the bank

purchased over the notes that were returned to A. R. Clark & Co. The bill of sale shows that 598 dozen cases brand Perfection peaches of the value of $1,082.38 entered into the transaction, while it is the testimony of the cashier that the difference of $321.67 was put to the credit of A. R. Clark & Co., and subject to his cheque and subsequently paid.

We cannot resist the conclusion from a careful examination of all the evidence, that the proof fails to show that such fraud was resorted to by A. C. Clark & Co.; that he could not convey a good title to the Equitable National Bank under the circumstances, and that, assenting to the principle that a purchaser of goods, fraudulently obtained, can not hold his title against his vendee in payment of a pre-existing debt, there still passed a present cash consideration. Even admitting that the burden of proof is upon the bank, we think the evidence shows that it was a *bona fide* purchaser for value. The Equitable National Bank parted with value upon the faith of the apparent title of A. R. Clark & Co., and their right to dispose of the peaches. It is not claimed that there was any notice of any defect in the vendor's title, and certainly A. R. Clark & Co. were clothed with the insignia of title.

It is urged again that the purchase was fraudulent from the fact that the purchaser had no reasonable intention to pay for the goods, and the case of *Talcott* v. *Henderson*, 31 Ohio St. 162, is cited in support of that claim. It is undoubtedly the law that a contract for the purchase of goods on credit, made with intent on the part of the purchaser not to pay for them, is fraudulent, and if the purchaser has no reasonable intention of being able to pay for them, it is equivalent to an intention not to pay; but where the purchaser intends to pay, and has reasonable expectations of being able to do so, the contract is not fraudulent, although the purchaser knows himself to be insolvent and does not disclose to the vendor, who is ignorant of the fact.

McILVAINE, J., in announcing the opinion of the court, says: "It is claimed that, in good morals, a purchaser, knowing himself to be insolvent, should not accept credit from one ignorant of the fact. Whether this proposition be true or not, it is enough to say that the law, in its practical morality, does not afford a remedy for the violation of every moral duty. While, therefore, a purchase of goods by an insolvent vendee, who conceals his insolvency, with intent to injure the vendor, is fraudulent and voidable, yet a purchase under like circumstances, save only that such intent is absent, is not, in law, fraudulent. * * * It is quite sure that they could not reasonably have expected to be able, at that time, to pay all their indebtedness; but, in our opinion, it was not essential to the good faith of the transaction that there should have been reasonable grounds for the latter expectation; it was enough, if they reasonably expected to be able to pay for the goods in question at maturity * * * Where an insolvent merchant is engaged in an honest effort to retrieve his fortunes, the appearance of wealth indicated by his stock in trade is not equivalent to a representation of solvency; and one who gives him credit, without inquiry, has no right to complain of fraud."

The order for the peaches was obtained by W. W. Blair & Co., the representatives and brokers of the plaintiff, on June 25, 1892. The peaches were not even ordered to be shipped by A. R. Clark & Co., but were sent unsolicited by the plaintiff on November 16, 1892. There is no evidence to show that A. R. Clark & Co. knew themselves to be insolvent at the time the order was given, nearly six months before the assignment, nor even at the time the goods were delivered to A. R. Clark & Co., or by that firm sold to the defendant, beyond the inventory filed in the probate court exhibiting the condition of the firm at the time of the assignment.

It is the testimony of Mr. Langdon, the bookkeeper, that the business of A. R. Clark & Co. was carried on in the usual way to the date of the assignment, and that he had no idea or intimation of any assignment until informed of it after the assignment had been made.

J. W. Blair, the cashier of the bank with whom A. R. Clark & Co. deposited for three years, testifies that although collateral was required from A. R. Clark & Co., for some time prior to the assignment, yet the deposits of the firm ran about the same right straight up to the time of the assignment, and that Clark said decidedly "No!" to any thought of assignment.

The case of *Dean* v. *Yates et al.*, 22 Ohio St. 388, is cited by plaintiff to the effect that a *bona fide* purchaser of goods from one in possession for a valuable consideration and without notice of any defect in his vendor's, title, can not be protected against the title of the true owner in a case where the vendor had fraudulently obtained his possession, and without the knowledge or consent of the owner, although previous to such possession he had, by false and fraudulent representations, induced the owner to enter into a contract for the sale.

The rule is correctly stated but the court says in the same case, "if the plaintiff, however, had delivered the goods under the sale to the fraudulent purchaser, and thus clothed him with the insignia of title, a different rule would have prevailed, to-wit, where one of two innocent persons must suffer from the fraud of a third, he who first trusted such third person and placed in his hands, the means which enabled him to commit the wrong must bear the loss."

This principle may fairly be invoked in this case.

Judgment for the defendant.

*C. K. Shunk*, for plaintiff.

*D. Heinsheimer, Jr.*, contra.